IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

IRVIN T. TATUM,

        Plaintiff,                      No. CIV S-03-0324 FCD EFB P

    vs.

CHERYL K. PLILER, et al.,

        Defendants.               FINDINGS AND RECOMMENDATIONS

_____/

       Plaintiff is a prisoner without counsel seeking relief for alleged civil rights violations. *See* 42 U.S.C. § 1983. This action proceeds on the complaint filed February 24, 2003, in which plaintiff makes the following claims: (1) C. Pliler, Rosario, Vance, Connor, Murphy, Rodgers and Lytle responded to isolated disturbances by placing African-Americans on lockdown and restricting their privileges and access to programs in violation of the Equal Protection Clause of the Fourteenth Amendment; (2) defendants Pliler and D. Hasad have refused to maintain current resources in the law library in violation of plaintiff's right of access to the courts; (3) defendant W. Haythorne has denied plaintiff a nutritiously balanced diet; (4) defendants C. Pliler and T. Rosario maintain a policy prohibiting plaintiff from eating in the dining hall in violation of the Equal Protection Clause; and (5) defendants have violated plaintiff's rights under the Equal Protection Clause by denying him access to rehabilitative programs.

Defendants move for summary judgment on all claims. Plaintiff moves for summary judgment on his equal protection claims. For the reasons stated below, summary judgment must be granted in favor of defendants on all claims except the equal protection claim arising out of the lockdown. As discussed below, neither side has addressed the applicable standard or shown that they are entitled to summary judgment on plaintiff's claims that the lockdowns imposed on October 3, 2002, and on December 28, 2002, and made applicable only to African Americans as of January 2003, violated his rights under the Equal Protection Clause of the Fourteenth Amendment.

## I.  Facts

Plaintiff is African American. From May 2002 through February 2003, the time of the events giving rise to this action, plaintiff was in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), and was confined in Facility B of the California State Prison, Sacramento ("CSC"). This is a level IV prison with a 180 degree design, where the most violent and difficult to manage prisoners are housed. Defs.' Mot. for Summ. J., Exh. 1, Declaration of S. Vance ("Vance Dec."), at 2, 4. Defendant C. Pliler was the Warden and T. L. Rosario was the Chief Deputy Warden. Complaint at 2-3. Defendants Lieutenant D. Connor, Sergeant A. Murphy, Sergeant C. Rodgers and Sergeant D. Lytle were correctional officers. *Id.* at 3-4. Defendant D. Hasad was the academic supervisor in charge of maintaining updated materials for the law library at CSC. *Id.* at 4. Defendant W. Haythorne was the food manager at CSP. *Id.* Defendant S. Vance was the Facility Captain. Vance Dec., at 1.

The central issue in this action is the constitutionality of various lockdowns. A lockdown is a security measure, defined as follows:

> Lockdown means that a portion of the facility is affected by suspension of required programs or services, and inmates are not released except as determined by the facility administration on an individual, case-by-case basis. As determined by the facility administration, under such circumstances only critical inmate workers in the affected housing units/sub-facilities will be permitted to attend to work assignments under escort, and all but essential functions are suspended in those affected housing units or sub-facilities, e.g., yard, canteen draws, religious

services and visiting. Cal. Code Regs. tit. 15, § 3000. When an incident which seriously threatens institutional safety and security occurs in a particular facility, the facility captain and lieutenant (here, Vance and Connor, respectively) assess the situation and recommend to a lockdown committee either to impose a lockdown or not. Vance Dec., at 3. Only Warden Pliler, Chief Deputy Warden Rosario, Associate Warden Jackson[1] and Captain Vance were authorized to declare a lockdown. *Id.* Only Warden Pliler had the authority to end a lockdown. *Id.* During some lockdowns, prison officials suspend privileges, such as canteen and yard time, based on concerns for the safety of prisoners and staff. *Id.* Necessities, such as medical treatment, legal materials and showers, to which prisoners are escorted, are not suspended. *Id.* at 4. A lockdown continues until prison officials completely have evaluated the institution's safety and security, whereupon the prison gradually is returned to normal. *Id.* Generally, prisoners who were not involved in the incident and who pose no security threat are released first. *Id.* Other prisoners gradually are released under closely monitored circumstances to prevent a violent outbreak. *Id.*

Plaintiff's complaint does not specify when the lockdowns in which his rights allegedly were violated occurred. However, defendants offer evidence of three lockdowns affecting African-Americans in Facility B while plaintiff was housed there. Vance Dec., at 2. The first was September 5, 2002, when prison officials declared a modified program, which is a lockdown limited to one particular group. *Id.* The prisoners affected were those known to associate with the "Bloods," a gang. *Id.* While most prisoners who associate with the Bloods are African American, not all African Americans were placed on modified program. On September 20, 2002, the modified program was lifted. *Id.*

Another lockdown was imposed in early October 2002. Vance Dec., at 2. On October 3, 2002, whites and hispanics were placed on modified program following a riot between members

---

[1] Associate Warden Jackson is not a defendant.

1  of these groups. *Id*. In the ensuing investigation designed to identify the prisoners involved,
2  investigators found a number of weapons buried in the recreation yard where white prisoners
3  congregate and where African American prisoners congregate. *Id*. Soon after discovering the
4  weapons, prison officials placed all African American prisoners on modified program while they
5  investigated to determine to whom the weapons belonged and who had hidden them on the yard.
6  *Id.* During this modified program, non-essential privileges, such as family visits, yard time,
7  canteen access and telephone use were limited. *Id*. By November 13, 2002, the prisoners
8  involved with hiding the weapons had been identified, the investigation was concluded and
9  prison officials returned African American prisoners to normal program. *Id*. at 3.

10  The third lockdown occurred on December 28, 2002, after a large group of African
11  American prisoners attempted to kill two correctional sergeants. Vance Dec., at 3. Defendant
12  C. Pliler immediately declared a state of emergency and imposed a lockdown on the entire
13  institution. *Id.* Prison officials investigated to determine whether this was an isolated incident or
14  a serious threat against all officers. *Id*. In January of 2003, all prisoners categorized as Asian,
15  American Indian or "other," were removed from lockdown because prison officials determined
16  that they were not involved. *Id*. During this lockdown, staff faced additional security threats,
17  which prolonged the lockdown. *Id*. There is no evidence presented that plaintiff was involved in
18  any of the incidents that gave rise to the decisions to impose any of these lockdowns.

19  In January of 2002, in response to a series of violent attacks in level IV dining halls,
20  Warden Pliler stopped permitting level IV prisoners to take meals in the dining hall, ordering
21  that they be fed in their cells. Vance Dec., at 4. The purpose of this measure was to limit
22  violence among prisoners. *Id*. Prison officials have determined that when Level IV prisoners eat
23  together in a common area, there tends to be a high number of attacks both on other prisoners
24  and on staff. *Id*. Prison officials determined that the benefit of permitting these prisoners to eat
25  together was outweighed by the increased safety and security. *Id*. After Warden Pliler
26  implemented this measure, prisoner violence decreased. *Id*.

Turning to plaintiff's allegations about the nutritional value of his meals, defendants submit evidence that the CDCR, not individual prison wardens, decide what meals will be served to the prisoners. Defs.' Mot. for Summ. J., Exh. 2, Declaration of Susan B. Summersett, R.D. ("Summersett Dec."), at 2. In 1998, CDCR established a Standardized Menu Review Team ("SMRT") to plan a menu, develop recipes and document the nutritional adequacy of a "heart-healthy" menu. *Id*. The SMRT consists of representatives from Institutions Division, Health Care Services Division and CDCR headquarters. *Id*. The Departmental Operations Manual (DOM) requires all institutions to follow a standardized, department-wide menu. DOM § 54080.6. This menu prescribes a low fat, "Heart Healthy" diet. DOM § 54080.6. Institution heads and correctional food managers must ensure consistent adherence to this food plan, but they may modify the standard recipes to reduce fats, salts, sugars and spices. *Id*. Initially, SMRT followed the federal Recommended Dietery Allowances (RDA), but in 2001 was changed to the Dietary Reference Intakes to establish levels of nutritional need. *Id*. Some fruits, like oranges, are prohibited because prisoners were discovered using them to make alcohol. *Id*. at 3. Despite these restrictions, all meals contain the necessary nutrients and vitamins for a well-balanced diet. *Id*. Prison officials at CSP provide prisoners meals that comply with the menu required by the CDCR. *Id.*

## II.    Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[2] The utility of Rule 56 to determine whether there is a "genuine issue of material fact," such that the case must be resolved through presentation of testimony and evidence at trial is well established:

---

[2] On February 4, 2004, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

5

> [T]he Supreme Court, by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment. First, the Court has made clear that if the nonmoving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Second, to withstand a motion for summary judgment, the non-moving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis added). Finally, if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). No longer can it be argued that *any disagreement* about a material issue of fact precludes the use of summary judgment.

*California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert. denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added). In short, there is no "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Grimes v. City and Country of San Francisco*, 951 F.2d 236, 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322). There can be no genuine issue as to any material fact where there is a complete failure of proof as to an essential element of the nonmoving party's case because all other facts are thereby rendered immaterial. *Celotex,* 477 U.S. at 323.

### III.  Analysis

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252. Here, plaintiff's action arises under 42 U.S.C. Section 1983, and the First, Eighth, and Fourteenth Amendments. To prevail at trial, he must prove that the defendants deprived him of

his rights while acting under color of state law. To prove that his First Amendment right of access to the courts was violated, plaintiff must prove by a preponderance of competent evidence that he was denied necessary assistance in preparing and filing a habeas corpus petition or section 1983 complaint and that the deprivation actually injured his habeas or section 1983 litigation efforts. *Lewis v. Casey*, 518 U.S. 343, 351, 354, 356 (1996). To prove an Eighth Amendment violation, plaintiff must show that the defendant knew plaintiff faced a risk of harm that "is not one that today's society chooses to tolerate," and that the defendant was "deliberately indifferent" to that risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). To prove a violation of the Equal Protection Clause, plaintiff must prove that the defendants intentionally discriminated against him based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (1998). As discussed below, the only genuine issues for trial arise with respect to two of the lockdowns.

The court begins with plaintiff's claims under the Equal Protection Clause of the Fourteenth Amendment. He challenges the imposition of lockdowns and the attendant restriction of privileges, and denial of access to rehabilitative programs which, he alleges, were based on race. The Fourteenth Amendment's guarantee of equal protection is a command that states treat similarly situated persons alike. *City of Cleburne, Tex. v . Cleburne Living Center*, 473 U.S. 432, 439 (1985) (per curiam). This guarantee applies inside prison walls. *Lee v. Washington*, 390 U.S. 333, 333 (1968). As a threshold matter, defendants misapprehend the most fundamental step in the analysis of equal protection: the relevant standard of review of governmental action involving class based disparate treatment of persons. While defendants assert that racial discrimination inside prisons need only be reasonably related to a legitimate penological interest, this simply is not the case. The Supreme Court has made clear that when a prisoner alleges discrimination based on race, strict scrutiny applies. *Johnson v. California*, 543 U.S. 499, 509 (2005). The purpose of this level of scrutiny is to "smoke out illegitimate uses of race by ensuring that the government's classification is closely fitted to the compelling goals that it seeks

to achieve." *Richmond v. J. S. Croson Co.*, 488 U.S. 469, 493 (1989). Thus, once a prisoner has come forward with evidence of intentional race-based discrimination, prison officials have the burden of proving by a preponderance of the evidence that the disparate treatment is a "narrowly tailored measure [] that further[s] compelling governmental interests." *Adarant Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Washington v. Davis*, 426 U.S. 229, 239-240 (1976).

Here, plaintiff, who is African American, asserts that whenever an "isolated" incident involving other African-American prisoners occurred, defendants Cheryl Pliler, T. Rosario, S. Vance, Connor, Rodgers, Murphy and Lytle placed all African-American prisoners, including plaintiff, on lockdown and restricted their privileges, such as visits, canteen, receiving packages in the mail and time on the yard. Pl.'s Mot. for Part. Summ. J., at 4-5. Plaintiff seems to assert that this violated his rights because white prisoners who, like him, were not involved in the isolated incidents were not placed on lockdown. He contends that these actions amount to intentional, invidious discrimination.[3] *Id*. at 4. Defendants argument that the lockdowns and attendant restrictions were constitutional because they were reasonably related to the need to maintain prison security fails to address the standard by which their actions are measured under the Equal Protection clause. *See* Defs.' Opp'n, at 9. The relevant inquiry is whether defendants' evidence satisfies heightened scrutiny. There is no question that prison security is a compelling governmental interest. *Johnson*, 543 U.S. at 512; *see also*, *Pell v. Procunier*, 417 U.S. 817, 823 (1974); *May v. Baldwin*, 109 F.3d 557, 563 (9th Cir. 1997). The only question, therefore, is whether there is a genuine dispute about whether intentional race-based discrimination in the lockdowns and restrictions were the least discriminatory means of achieving the goal of prison security. The court must ensure that the state's resort to race-based discrimination here "is

---

[3] In support of his motion, plaintiff attaches a June 19, 2006, memorandum explaining a June 15, 2006, lockdown affecting African-American prisoners and the June 19, 2006, release of white prisoners from a lockdown imposed on them April 8, 2005. He also submits a declaration complaining in general of racial discrimination occurring since he filed the complaint. Since the complaint was filed in 2003, this evidence is of little or no relevance. *See* Fed. R. Evid. 401, 402.

closely fitted to the compelling goals that it seeks to achieve." *Richmond v. J. S. Croson Co.*, 488 U.S. at 493.

As noted above, plaintiff nowhere specifies the dates of the lockdowns he challenges. Thus, the court considers defendants' evidence relating to all three lockdowns. The undisputed facts show that on September 5, 2002, there was an altercation involving members of the Bloods. In response, defendants immediately placed prisoners known to associate with this gang on lockdown, and released them on September 20, 2002. In *Johnson*, the Supreme Court found that housing prisoners "only with other inmates of the same race," is a form of segregation. *See Johnson*, 543 U.S. at 507. There is no meaningful distinction between housing prisoners of the same race together and separating all prisoners of the same race from the general population by confining them to their cells. Each is a form of segregation based on race. Therefore, imposing a lockdown on members of a particular race constitutes segregation subject to the same analysis as *Johnson*. However, plaintiff overstates the case to claim that the lockdown imposed here was based on racial classification. While most members of the Bloods are African American, not all African Americans were included in this lockdown. Rather, the distinguishing characteristic was known membership or affiliation with a violent gang. Therefore, this lockdown was not based on race, but instead on membership in a violent prison gang. Thus, even if plaintiff was placed on lockdown as an associate of the Bloods, it was not the result of invidious, race-based discrimination. On this evidence, no reasonable jury could conclude that from September 5 until September 20, 2002, plaintiff was placed on lockdown solely because of his race. With respect to this claim, plaintiff's motion must be denied and defendants' motion must be granted.

Defendants also have submitted evidence that on October 3, 2002, there was a riot between white prisoners and hispanic prisoners, and that in response, white and hispanic prisoners were placed on lockdown. In the ensuing investigation, prison officials found a number of weapons buried in the yard in distinct areas, i.e., a location where white prisoners congregate and another location where African American prisoners congregate. Thereafter,

1  defendants placed all African American prisoners on lockdown and restricted their non-essential
2  privileges, such as family visits, yard time, access to the canteen and telephone use.  By
3  November 13, 2002, prison officials determined that the security risk had been abated, and they
4  released African Americans from lockdown.  This lockdown, indisputably, was based on race.
5  As explained above, its legality under equal protection analysis must be evaluated pursuant to
6  strict scrutiny under *Johnson*.  Furthermore, the segregation here clearly was intentional in that
7  conscious decisions were made to place three racial groups on lockdown.  The question, then, is
8  whether this response to past and imminent future violence fits closely with the goal of
9  maintaining prison security.  Regrettably, defendants have not addressed this question.

10  The court concludes, on the basis of the record currently before it, that there is a genuine
11  issue for trial on this question.  Defendants' evidence plainly shows that gang violence was an
12  ongoing security problem, and that the weapons were found during an investigation of a riot
13  between hispanic prisoners and white prisoners.  Prison officials also found weapons in a
14  location on the yard where African-American prisoners generally congregated and it was
15  reasonable to suspect that one or more of these inmates hid them.  It is not clear from the record
16  how long the lockdown lasted, but it appears to have been no more than about six weeks.  There
17  is no serious question that this response is reasonably related to the goal of prison security.
18  Under rational basis scrutiny, argued by defendants, the lockdown would clearly pass
19  constitutional muster.  But the standard applicable is strict scrutiny and the Supreme court has
20  admonished that even in the context of gang violence within prisons, "racial classifications
21  threaten to stigmatize individuals by reason of their membership in a racial group and to incite
22  racial hostility."  *Johnson*, 543 U.S. at 507 (*citing Shaw v. Reno*, 509 U.S. 630, 650 (1993)).
23  Accordingly, "[w]hen government officials are permitted to use race as a proxy for gang
24  membership and violence without demonstrating a compelling government interest and proving
25  that their means are narrowly tailored, society as a whole suffers." *Johnson*, 543 U.S. at 511.  It
26  is no answer that whites and hispanics were locked down based on race in response to a riot.

Rather, that fact simply raises the same question as those race-based decisions. *See Johnson*, 543 U.S. at 506 ("[R]acial classifications receive close scrutiny even when they may be said to burden or benefit the races equally.").

Whether the decision here to lock down inmates based on race can be justified under strict scrutiny is an important question that defendants have not addressed. Responding to past gang violence and taking action to forestall imminent threat of future violence at the prison are obviously compelling state interests. But defendants, in arguing the wrong standard, have not even attempted to demonstrate that before locking down all African-American prisoners, they considered less discriminatory alternatives or that no such options existed. Plaintiff, on the other hand, has not submitted evidence showing that the response was not narrowly tailored to prison security nor addressed the issue in his motion. For purposes of the *Celotex* standard for summary judgment, it is important to note that it is defendants, not plaintiff, who bear the ultimate burden at trial on this issue. *Johnson*, 543 U.S. at 505 ("Under strict scrutiny, the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.'"); *Adarant Constructors, Inc.*, 515 U.S. 227; *Washington*, 426 U.S. at 239-240. It cannot be concluded on the basis of this record that defendants' choice to resort to racial discrimination in the lockdowns was narrowly tailored and, in fact, the least discriminatory means available to prevent violence. Moreover, the burden on this question cannot be placed on plaintiff. Therefore, the absence of evidence on the question cannot, under *Celotex*, serve as a basis for granting defendants summary judgment on whether this lockdown violated plaintiff's right to equal protection. Both motions must be denied with respect to this lockdown.

The last lockdown implicated in this action was imposed on December 28, 2002, after a large group of African American prisoners attempted to kill two correctional sergeants. Defendant Pliler immediately declared a state of emergency and imposed a lockdown on all prisoners, regardless of race. The ensuing investigation was designed to determine whether this

1  was an isolated event or a serious threat to all correctional officers.  In January of 2003, prison
2  officials determined that prisoners categorized as Asian, American Indian or "other" should be
3  released because investigation revealed that no prisoners in these groups were involved.
4  African-American prisoners were held on lockdown until June 13, 2003.  The inference is that
5  this was because some or all of the inmates invloved in the attempt were African Americans.
6  The initial lockdown applied to the entire facility and was not based upon race.  However,
7  prisoners of all other racial designations were released before African Americans, raising the
8  inference that the investigation itself was conducted on racial lines.  Clearly, the continued
9  lockdown of African-American prisoners after January 2003 was race-based.  Yet despite this
10 fact, defendants again fail to address the strict scrutiny standard that must be used to determine
11 the constitutionality of that action.  They offer no explanation of why *all* African-American
12 prisoners continued to be held on lockdown after the investigation had commenced, or why they
13 remained so confined for six months.  Without evidence to answer these questions, a reasonable
14 jury could find that the lockdowns and concomitant denial of privileges violated plaintiff's equal
15 protection rights.  Again, it must be noted that defendants bear the burden of proof on the
16 question of whether this raced-based action by the prison authorities was the least discriminatory
17 alternative available to prevent violence.  Defendants have not shown that they are entitled to
18 summary judgment as to this lockdown.  Although it is defendants', not plaintiff's burden,
19 plaintiff also fails to address the strict scrutiny standard and whether the lockdown was or was
20 not narrowly tailored to achieve the goal of prison security.  Thus, both motions for summary
21 judgment must be denied.
22      The court next addresses plaintiff's claims that defendants Pliler and Hasad violated his
23 right of access to the courts.  He alleges that C. Pliler and D. Hasad purposely refused to order
24 current legal materials for the law library.  To show a violation of the right, plaintiff must
25 demonstrate that the alleged shortcomings hindered his efforts to pursue a claim related to his
26 conviction or the conditions of his confinement.  *Lewis v. Casey*, 518 U.S. 343, 351, 354, 356

(1996). Hindrance justifying relief include, "for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." *Lewis*, 518 U.S. at 351. Prisons must provide tools "the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Id.*, at 356 "When any inmate, even an illiterate or non-English-speaking inmate, shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates that the State has failed to furnish adequate law libraries or adequate assistance from persons trained in the law." *Id*. Defendants contend that plaintiff cannot muster evidence to show a genuine issue about whether he suffered a cognizable injury, even assuming that he was deprived of the tools needed for litigation. Plaintiff has not alleged or submitted any evidence of a single habeas corpus or civil rights action that he could not bring or which was dismissed, and that such action had merit. Furthermore, plaintiff has litigated this action for over three years. On this evidence, no reasonable jury could find in his favor. Defendants Hasad and Pliler are entitled to judgment as a matter of law on this claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

Plaintiff also claims that defendant W. Haythorne has denied him adequate nutrition in violation of the Eighth Amendment. Defendant Haythorne contends that prison food is nutritionally balanced and, therefore, plaintiff is not denied a basic human need. The Eighth Amendment prohibits deliberate indifference to conditions violating contemporary standards of decency, such as denying "the minimal civilized measure of life's necessities," or posing risk of a harm "that is not one today's society chooses to tolerate." *Rhodes v. Chapman*, 452 U.S. 337 (1981); *Helling v. McKinney*, 509 U.S. 25, 36 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837

1  (1994).  Thus, prison officials are deliberately indifferent when they know of and disregard a
2  prisoner's basic human need.  Adequate food is a basic human need protected by the Eighth
3  Amendment.  *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).  While prison food need not
4  be "tasty or aesthetically pleasing," it must be "adequate to maintain health."  *LeMaire v. Maas*,
5  12 F.3d 1444, 1456 (9th Cir.  1993) (providing Nutraloaf, a nutritionally adequate blend of fresh
6  ingredients designed to be given to inmates without eating utensils is not a deprivation serious
7  enough to violate the Eighth Amendment); *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996)
8  (plaintiff adduced sufficient evidence to survive summary judgment on claim food was spoiled,
9  tampered with, raw, and failed to meet a balanced nutritional level and that the water was
10 blue/green in color and foul tasting.").

11     In determining whether a deprivation objectively is serious enough to violate the Eighth
12 Amendment, the court considers the circumstances, nature and duration of the deprivation.  "The
13 more basic the need, the shorter the time it can be withheld."   *Hoptowit v. Ray*, 682 F.2d at
14 1259.  Plaintiff asserts that defendant Haythorne has prohibited prison staff from ordering "fruit
15 or other nutritional food products that are high in vitamin C, thereby denying plaintiff a diet that
16 includes vitamin C."  Comp. at 10.  He also alleges that the prison diet is so unbalanced that he is
17 denied his basic nutritional needs.  Defendant Haythorne has submitted evidence that CDCR has
18 a team that develops a standard menu for all institutions and documents its nutritional adequacy
19 in relation to independently established benchmarks.  Before 2001, nutritional value was set by
20 reference to the federal Recommended Dietary Allowances, but in 2001 CDCR changed to the
21 Dietary Reference Intakes.

22     It is undisputed that defendant Haythorne does not decide what will be on the menu.
23 Instead, individual wardens and food managers are responsible for ensuring that their institution
24 consistently complies with the standards.  Wardens and food managers may modify the standard
25 recipes to reduce fats, salts, sugars and spices.  At CSC, certain fruits, like oranges, are
26 prohibited because prison staff discovered prisoners using them to make alcohol, but as a whole

14

1 meals nonetheless nutritionally are balanced.

2 There is no evidence that plaintiff suffers from any vitamin deficiency because he does not get oranges or other fruits that could be fermented. Nor is there any evidence demonstrating that despite the standard menu and its nutritional benchmark, plaintiff's food nutritionally is inadequate. On this evidence, a reasonable jury could find that prisoners do not receive fresh oranges, and that there is a legitimate penological reason for this particular deprivation. But no reasonable jury could find on this evidence that plaintiff receives constitutionally inadequate nutrition. Accordingly, there is no genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252. Defendant Haythorne's motion must be granted.

Plaintiff also claims that defendant Pliler's decision to have certain prisoners eat in their cells violated his right to equal protection. Defendant Pliler asserts that since the policy was not based on a suspect classification, plaintiff has the burden of showing that the policy was not rationally related to a legitimate governmental interest, which plaintiff cannot do. Here, rational basis scrutiny applies and defendant Pliler addresses the correct standard. The cell-feeding policy applied to security Level IV prisoners. There is no evidence that race or any other suspect classification is a factor that determines the security level of a prisoner. *See City of Cleburne, Tex.*, 473 U.S. at 470-71 (discussing protected classes and purpose of the Equal Protection Clause). On this evidence, no reasonable jury could find in plaintiff's favor on this claim.

Plaintiff's final claim is that defendants denied him opportunities for rehabilitation in violation of the Equal Protection Clause of the Fourteenth Amendment. It is not clear from the complaint that plaintiff means to assert that defendants discriminate in deciding who may participate in what programs independently of the restrictions that attend lockdowns. Insofar as this is plaintiff's claim, he does not allege that any defendant treated him differently than prisoners who are not African American when deciding whether plaintiff could participate in a rehabilitation program. Thus, plaintiff does not state a claim for relief and his motion on this claim must be denied.

15

Accordingly, it is hereby recommended that:

1. Plaintiff's June 27, 2006, motion for partial summary judgment be denied;

2. Defendants C. Pliler, Rosario, Vance, Connor, Murphy, Rodgers and Lytle's June 19, 2006, motion for summary judgment be denied with respect to plaintiff's claims that the lockdowns imposed on October 3, 2002, and on December 28, 2002, as applicable to African Americans as of January 2003, violated plaintiff's rights;

3. Defendants C. Pliler, Rosario, Vance, Connor, Murphy, Rodgers and Lytle's June 19, 2006, motion for summary judgment be granted with respect to plaintiff's claim that the September 5, 2002, lockdown violated his rights under the Equal Protection Clause of the Fourteenth Amendment;

4. Defendant Haythorne's June 19, 2006, motion for summary judgment be granted on the claim that the meals he provided were not sufficiently nutritious in violation of the Eighth Amendment;

5. Defendants Pliler and D. Hasad's June 19, 2006, motion for summary judgment be granted with respect to plaintiff's claim that he was denied access to the courts;

6. Defendants' June 19, 2006, motion for summary judgment be granted on plaintiff's claim that he has unconstitutionally been denied access to rehabilitative programs;

7. Plaintiff be directed to file a pretrial statement within 30 days; and

8. Defendants be directed to file a pretrial statement within 20 days thereafter.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections

////

////

1  within the specified time may waive the right to appeal the District Court's order. *Turner v.*
2  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).
3  Dated:   June 11, 2007.

_____
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE